1828.

Brown
v.
Lynch.

---

## *Brown v. Lynch and Lynch.

[*147]

Thomas L. and J. L. were owners of a farm in Orange county, which, in 1811, was, by a fraud upon them, mortgaged to R. The mortgage was foreclosed in Chancery, and the farm advertised for sale by a master. Before the sale, B., by an arrangement with Thomas L. and J. L., agreed to purchase in the farm for their benefit, for which he was to receive a stipulated compensation. R., the mortgagee, in order to favor Thomas L. and J. L., agreed with B. that he might bid off the property for $1,500, about half the amount of the mortgage. B., at the sale, prevented others bidding, by representing that he intended to buy for Thomas L. and J. L. B. purchased the farm at the master's sale for $1,540, about 1,000 below value. Afterwards B. refused to convey the farm to Thomas L. and J. L., or to account to them for the value, although they tendered to him the amount of his bid, with interest, and the sum agreed to be paid for his services. It was held that B. was a trustee for Thomas L. and J. L., and had no other interest in the farm than that of a mortgagee to secure the repayment of the purchase-money, and the payment of the sum agreed to be allowed him for his services.

It was also held, that a purchaser of the farm from B., with full knowledge of the claim of Thomas L. and J. L., was an incompetent witness for B.

A court of chancery relieve against a fraud, by converting the person guilty of it into a trustee for those who have been injured thereby.

APPEAL from the Equity Court of the Second Circuit. The facts in the case, and the reasons for the decree in the court below, are stated in the following opinion delivered by Judge EMOTT in the Equity Court.

OPINION:—The plaintiffs were owners of a farm in Cornwall, in Orange county, which, in 1811, by a fraud upon them, was mortgaged by their brother, Nathaniel Lynch, to John C. Romeyn, of New-York. The mortgage was foreclosed in Chancery, and the lands advertised by a master for sale, on the 29th day of May, 1824. They were sold to the defendant on the 8th day of June, for $1,540. The farm was, in fact, worth $2,500, and was sold by the defendant to Benjamin Colter, in March, 1825, for $2,300. Thus far, the parties agree as to the facts; but in what follows, they are at issue: the defendant denying fully the statement made by the plaintiffs. The plaintiffs alleged that the purchase was made by the defendant under an agreement and understanding between them, that it should

[*148]
be for the benefit of the *plaintiffs; and the defendant having, by management and imposition, obtained the title, he now, oppressively, and meaning to take an undue advantage of the plaintiffs, claims the property as his own, and will neither convey to them, or account to them for the value.

A further part of the case on the part of the plaintiffs is, that the purchase was made at a reduced amount, and at about half the mortgage rent, with the consent of Romeyn, the mortgagee, to favor the plaintiffs. This averment is, I think, sufficiently made out by the testimony of Benjamin Van Dusen; who says that the defendant, between the postponement and the sale, told him that he had agreed with the holder of the incumbrance for the property at $1,500, but that it still must be set up for sale; and of James Green, who testified, that before the sale, the defendant told him he had been to New York and bought

the land of Romeyn, who held the mortgage, and that the defendant at the sale, said to Romeyn that he was buying for the plaintiffs, and Romeyn then said it should go for $1,500. This being so, we are not bound or embarrassed by the decisions about agreements not to bid at public sales. A combination to prevent bidding at a sale on execution, is held contrary to morality and sound policy, and every contract on such combination is void, as it operates as a fraud upon the debtor and all his other creditors, and opens a door to oppressive speculation. (*Jones* v. *Caswell*, 3 John. Cas. 29. *Doolin* v. *Ward* 6 Johns. R. 194. *Wilbur* v. *How*, 8 John. R. 444. *Thomson* v. *Davis*, 13 John. R. 112.) If there was an agreement here to prevent bidding at the sale, it was with the assent of the creditor, giving to him the sum he was willing to receive, under the circumstances of the case, from the plaintiffs; and therefore not to his injury or prejudice. It was to save the property of the plaintiffs, and if they had other creditors, to give them the means to pay their debts; and therefore closed the door against speculations, and could not operate as a fraud upon any person. The true questions in this case are, has the fraud been made out? and can the court interfere if the fraud has been committed? The fraud alleged, it must be remembered, is, that the defendant, pretending to be a friend *to the plaintiffs, made arrangements with them and the mortgagee to purchase the property, for which he was to be paid a stipulated compensation; and that he prevented other persons bidding at the sale, or interesting themselves for the plaintiffs. By these means, it is said that he got the property at little more than half its value, and is now attempting to turn the profit to his own account. As to the fraud, Samuel McGill says that he and his father-in-law, Van Duzen, talked about purchasing, and would have purchased, if they had not been informed that the defendant was to purchase for the Lynches. On the morning when the property was to have been sold, the defendant was at the house of the witness, and told him he had the

margin: 1828.

Brown
v.
Lynch.

[*149

evening before agreed with the plaintiffs to go and buy the property for them, and said he thought it would be a shame for any man to come and run it up on them, for they had lived their best days on it, and had a great deal of bad luck, and ought to have the property. Van Duzen, the father-in-law, says that he attended the first day of sale to purchase; that the evening of the day of the adjournment he went to the defendant to ascertain whether he was going to buy for the plaintiffs: the defendant told him he had agreed for the property for the plaintiffs for $1,500. The witness would have given $2,500 for the property, but he gave up his intention of bidding on the declaration of the defendant that he was purchasing for the plaintiffs. David Lynch testified, that the defendant called on the plaintiff, Thomas Lynch, the night of the postponement; he said he had agreed for the property, and wanted the plaintiffs to make the title as bad as they could, so that he could buy cheap for them, and prevent others bidding. The defendant said the plaintiffs should have the property, and no one else. It was agreed that the defendant should have $60 for his trouble. James Green says, that a few days before the 29th of May, the defendant called on him to know whether he meant to bid on the property, and said he thought of buying for the plaintiffs. After the postponement, and before the sale, the defendant again called on him to ascertain whether he intended to bid, and said it would be unkind and unneighborly for him to do so, and that he was buying for the plaintiffs, and had agreed on *the sum with Romeyn. The defendant and the plaintiffs were in frequent private conversation at the sale. John B. Green testified, that the defendant, before the sale, applied to him to know if James Green intended bidding, and said he was going to buy for the plaintiffs, and wished Green not to bid. The defendant said that the title was not good, that he did not want to make anything, and expected nothing but his money. William Atkinson said, that on the day on which the property was first advertised, the defendant told him he had

bought the property for the Lynches, it was a hard case for them and he pitied them.   In addition to this, and to show the conduct and the pretended motives of the defendant before the sale, we have the further testimony of McGill, that the defendant, after the sale, said that the coming down of Bridgen, and the claim by him, was under a plan laid by the defendant and the plaintiffs, to prevent people from bidding on the property.   Van Duzen says, that after the defendant offered to sell the place, he told the witness it was a plan of his and Thomas Lynch to get Brigden to come to the sale and claim the property, and that the defendant appeared tickled about it, and laughed, and said the property was about to fall into his hands.   And William Southerland testified, that the defendant, after the sale, declared to him that he had said a good deal to prevent others from bidding on the property, and that he did it with a view to help the plaintiffs, and to buy in the lands cheap for their benefit.

There is other testimony which relates to the declarations and the acts of the defendant after the sale.   McGill says, that he did not attend the sale on the 8th of June, believing that the defendant was to buy in for the plaintiffs; that a short time, and not more than three weeks after the sale, the defendant said he had bought the property for the plaintiffs for $1,540, and had charged them $60 for his trouble, and that the plaintiffs were to pay for the property in the spring.   In December the witness applied to the defendant to hire the property, but he declined letting it, as he had bought it in for the plaintiffs, and expected they would redeem it.   Van Duzen says, he heard the defendant say several times, that the plaintiffs had a right to redeem by the 1st of April, by paying his bid of $1,540, with interest, and $60 for his trouble; and that he had *taken leases from the plaintiffs, and had included in the leases the interest to the 1st of April.   Southerland says, that in January or February he called on the defendant to buy the place, who offered to sell to him at $25 the acre.   The de-

[*151]

fendant said he had bought the property for the benefit or accommodation of the plaintiffs, if they could raise the money; but they had done a good deal to injure him, and they should not have the land unless they paid the full amount a stranger would pay, and he was sure they could not do that. Lancaster says, that in May or June, 1824, after the purchase, the defendant said he had not bought the land for himself, but that he bought for the plaintiffs, and that he went to the sale on purpose to buy for them; they were to have until the 1st of April to raise the money, but he would not be particular as to the time. The defendant spoke of the interference of Green, and said but for him he would have made a better bargain for the plaintiffs by forty dollars, and he thought it hard of Green that he bid after he knew the defendant was purchasing for the plaintiffs. Cook testified, that in April the defendant told him he bought the property for the plaintiffs, but they had not done as they ought to have done, and now they should not have it. And Taylor says, that he lived with the defendant at the time of the purchase, and once asked him if he meant to let the plaintiffs have the property; he said he did, if they ever got ready to redeem it, and he had told them to go on with their work as usual.

There was much additional testimony, which I have gone over with great care; but I do not think it materially varies the case.

I am satisfied, from all the testimony in the cause, that the defendant went into this purchase under the pretence of aiding the plaintiffs, who had been most grievously injured in the mortgage, and who were to be utterly ruined by it, if the whole amount of the incumbrance was to be exacted; and that he acted by the consent of, and under an agreement with the plaintiffs, who were to rest upon him, and to pay him for his services. I am also satisfied that the defendant, by representing to the mortgagee the hardships of the plaintiffs' situation, and he was acting for them in order to save *something to them, induced the mort-

[*152]

gagee to agree not to bid on the property over $1,500, or in other words, to receive that sum for his debt, which amounted to much more. And I am further satisfied, that the defendant, by getting the plaintiffs to aid him in casting a slur over the title, and by holding himself out to the world as the agent and friend of the plaintiffs, prevented a competition and bidding at the sale, and had a property struck off to him for $1,540, which was fairly worth $2,500, and which he now treats as his own, in defiance of the plaintiffs, and their claim under his agreement. It is apparent, then, that the defendant went into this purchase with fraudulent views, and has obtained a title to the property by trick and contrivance. It is fair for the defendant and for all others to advance their means by speculation or purchase; but they ought not to do it at the expense of honor or honesty, and if they make the attempt, it is at their peril. In this case, I am of opinion that it is established that the defendant has committed a fraud on the plaintiffs, by agreeing to purchase for their benefit, when, in truth, he meant to purchase for himself, in a manner to insure great profits; that he has committed a fraud on the mortgagee, by inducing him to believe that the purchase was for the plaintiffs, and thus prevailing on him to take about half of his debt. And he has committed a fraud on the public by false representations about the title, and of his intentions towards the plaintiffs; thereby preventing a bidding at the sale. It remains to be seen, whether a court of equity has power to correct the fraud. In *Pickett* v. *Loggon*, (14 Ves. 234,) Lord Eldon says: "It has long been settled that if a conveyance has been obtained by means, which in this court, have the character of imposition, fraud, oppression or undue advantage, the person deriving a title under it is a trustee, and the species of relief is by directing a reconveyance."

This is according to the doctrine of Lord Hardwicke, in *Barnesley* v. *Powell*, (1 Ves. 289,) and in *Young* v. *Peachy*, (2 Atk. 254.) A father having obtained an absolute con-

veyance from a daughter, in order to answer a particular purpose, afterwards made use of it for another, she was relieved under the head of fraud. Lord Hardwicke, in that case, *says, "There have been a great many cases, ever since the statute of frauds, where a person has obtained an absolute conveyance from another in order to answer one particular purpose, but has afterwards made use of it for another, that this court has relieved under the head of fraud; for a practice of this sort is a deceit and fraud which the court ought to relieve against: the doing it is a *dolus malus*, &c." In *Thynn* v. *Thynn*, (1 Vern. 296,) a man having made a will, and appointed his wife executrix, the son prevailed on his mother to get the father to make a new will, and to name him as executor, he promising to be trustee only for his mother. Upon the whole matter, it appearing to be as well a fraud as also a trust, Lord Keeper North, notwithstanding the statute of frauds, although no trust was declared in writing, decreed it for the plaintiff. In *Devenish* v. *Baines*, (Prec. in Ch. 3,) a copyholder, by his will, intending to give the greatest part of his estate to his godson, and the rest to his wife, she persuaded him to nominate her to the whole, promising to give the godson the part designed for him. On a bill filed, she plead the statute of frauds; but the lords commissioners decreed against her; not as an agreement or trust, but as a fraud.

In *Chamberlain* v. *Chamberlain*, (2 Eq. Ca. Abr. 43,) a son and heir apparent having persuaded his father not to make a will, by which he intended to make certain provisions for younger children, on his promise that they should have such provisions, it was decreed that the defendant should pay the legacies, let the assets be what they might. The same law will be found in *Reech* v. *Kennegal*, (1 Ves. 125,) in which case Lord Hardwicke says, "It is not necessary that the fraud should be on the person coming for payment alone:" it was here also a fraud on the testator. And in *Drakeford* v. *Wilkes*, (3 Atk. 539,) it was held that the legatee promising a testator in consideration

of a disposition in the will in her favor, she would do an act in favor of a third person, equity would make her perform. Lord Hardwicke says, that " If there is a declaration and understanding by a legatee to do an act, in consideration of the testator devising to that legatee, he knew of no case where the court had not directed it, *whether such understanding was before the will or afterwards." Of the modern cases, we have *Strickland* v. *Aldbridge*, (9 Ves. 516,) where, to a bill by the heir against the devisee, alleging that the devise was upon a secret trust or understanding for a charitable purpose, against the statute, a plea of the statute of fraud was ordered to stand for an answer, Lord Eldon saying it was clear that a trust would be created, upon the principle on which this court acts as to fraud. And in *Mestaer* v. *Gillespie*, (11 Ves. 626,) Lord Eldon says, upon the statute of frauds, although declaring that interest shall not be bound except by writing, cases in this court are perfectly familiar, deciding that a fraudulent use shall not be made of the statute, when this court has interfered against a party meaning to make it an instrument of fraud, and said he should not take advantage of his own fraud, even though the statute has declared that in case those circumstances do not exist, the instrument shall be absolutely void.

[*154]

Upon the authority of these cases, I have no doubt of the power of the court to correct the fraud, and it only remains to consider the best manner of doing it under the circumstances of the case.

The plaintiffs might certainly be permitted by a new bill in the nature of a bill of supplement, to follow the property in the hands of the person who has taken the conveyance during the pendency of this suit; and it is for that reason that I have held him interested, and suppressed his testimony ; but this would lead to more delay and expense than would be proper. The short way of ending the controversy will be to declare that the defendant, having committed a fraud as well on the plaintiffs as on Romeyn

1828.

Brown
v.
Lynch.

in the purchase, he was therefore a trustee for the plaintiffs, subject to the payment to him of the $1,540 paid on the purchase, and of $60, the compensation agreed on; and that the defendant, in making the sale to Benjamin Coulter, acted as the trustee of the plaintiffs, and is answerable to them for the amount of the sale, making the deductions of the two sums before mentioned.

In conformity to that opinion, the following decree was made in the equity court; from which decree the defendant below appealed to this court.

[\*155]

*" This cause having heretofore been brought to a hearing upon the pleadings and proofs therein, and the same having been argued by Mr. David Ruggles, of counsel for the complainants, and by Mr. George F. Tallman, of counsel for the defendant, and due deliberation being had thereupon, the court doth declare, that the said defendant committed a fraud upon the said complainants, in the purchase of the lands in the pleadings and proofs in this cause mentioned; and that he made such purchase, and received the conveyance of the said lands as trustee for the said complainants and for their benefit; subject, however, to the payment to him of the sum of one thousand five hundred and forty dollars, paid by the said defendant on such purchase, and the sum of sixty dollars, the compensation to the defendant for making the same, agreed upon by the parties, with interest on both sums from the 8th day of June, in the year one thousand eight hundred and twenty-four, the time of making such purchase; and that the said defendant, in making the sale of the said lands to Benjamin Coulter, in the proofs mentioned, acted as the trustee of the said complainants, and is answerable to them for the amount of the sale moneys, being the sum of two thousand three hundred dollars, with interest thereon from the nineteenth day of May, in the year one thousand eight hundred and twenty-five, the time of such sale, making the deductions of the two sums before mentioned; and it appearing to this court, by computation, making the charges and allowances

aforesaid, that there is due to the said complainants from the said defendant, the sum of seven hundred and thirty dollars and two cents, on the day of the date of this decree: It is therefore ordered, adjudged, and decreed, and the circuit judge of the second circuit, by the power and authority of this court, doth order, adjudge and decree, that the said defendant pay to the said complainants or to their solicitor, the sum of seven hundred and thirty dollars and two cents, with interest thereon from this day, together with the complainants' costs in this cause to be taxed, within thirty days after demand made and service of a copy of this decree upon the said defendant; and in default of such payment, that the said complainants have execution for the same."

*G. F. Tallman*, for the appellant:—Coulter was a competent witness. He had no interest in the event of the suit. *Nelson* v. *McDonald & others*, 6 John. Ch. R. 201.) The agreement between Brown and the Lynches was void for want of mutuality. · It could not have been enforced by Brown. (*Tucker* v. *Woods*, 12 John. R. 190.) It was also within the statute of frauds. It was not in the character of a mortgage. There was no loan to the Lynches; nor any resulting trust in their favor. The agreement, if there was one, had been rescinded by the Lynches. If there was any fraud, it was perpetrated by Brown and the Lynches in conjunction, with intent to injure the mortgagee. If so, they were *in pari delicto*, and the court would not assist either. If there was an agreement not to bid against each other at the sale, and they were to become partners in the purchase, the agreement was fraudulent, and against public policy. (*Doolin* v. *Ward*, 6 John. 195; *Thompson* v. *Davies*, 13 John, 112.) The facts in the cases cited by the circuit judge are not like those in this case. The bill does not meet the respondent's case. The relief given must be according to the case stated in the bill. (Mitf. Pl. 38, 39;

1828.

Brown
v.
Lynch.

*Wilkin & others* v. *Wilkin*, 1 John. Ch. R. 111; *Hiern* v. *Mill*, 13 Ves. 119; *Dormer* v. *Fortescue*, 3 Atk. 132.)

*D. Ruggles* and *P. Ruggles* for the respondents:—The agreement between Brown and the Lynches could have been enforced by Brown. The consideration was in his own hands. Brown, after his purchase, became in effect the assignee of the mortgage. The Lynches had the equity of redemption. The rule of *in pari delicto* does not apply to a court of equity. There the different degrees of guilt of parties are inquired into. (Eden on Injunc. 16; *Osborn* v. *Williams*, 18 Ves. 379; *Lord St. John* v. *Lady St. John*, 11 Ves. 535.) Courts of equity will not permit the statute of frauds to be made an instrument to perpetrate fraud. (Rob. on Frauds, 79, 102, 103; *Walker* v. *Walker*, 2 Atk. 98; *Barrow* v. *Greenough*, 3 Ves. 152; 2 Desaus. R. 141; *Reigal* v. *Wood & others*, 1 John. Ch. 406; 1 Cruis. Dig. 485, tit. 12, *Trust*, ch. 1; *Whelan* v. *Whelan & another*, 3 [*157] *Cowen, 537; *Boyd* v. *McLean*, 1 John. Ch. R. 582. *Clinan* v. *Cook*, 1 Scho. & Lef. 22.) Part payment alone does not take a case out of the statute. An essential injury must result from not executing the agreement in order to take the case out of the statute. (Prec. in Chan. 519; *Rice* v. *Peet*, 15 John. 503; *Botsford* v. *Burr*, 2 John. Ch. R. 405.) Where there is a part payment of money, there will be a resulting trust *pro tanto*. Here was a fraud committed by Brown. The mortgagee was not a *particeps criminis*.

THE CHANCELLOR:—A preliminary question has been raised as to the admissibility of the testimony of Benjamin Coulter as a witness for the appellant. Coulter purchased the premises in dispute with full knowledge of the claim of the respondents. He was, therefore, liable to lose the possession of the property which he had purchased, as well as the purchase-money which had been paid, if the plaintiffs in the court below succeeded in their suit.

It is true, he took a bond of indemnity from Brown, and

the decree subsequently made in the cause did not interfere with his right to retain the property. Even if it had appeared that Brown was perfectly solvent and able to indemnify him, it is doubtful whether that would have made him a competent witness; and at the time he gave his testimony, he could not know that the plaintiffs would be satisfied with the personal responsibility of Brown. I, therefore, am induced to think the order of the circuit court suppressing the testimony was correct; but whether it was or was not cannot be very material, as that testimony could not have varied the conclusion at which the judge arrived in relation to the facts of the case.

From the testimony in the case it is satisfactorily established, notwithstanding the denial in the appellant's answer, that he did agree to bid off the property for the respondents, and to give them time to redeem it, they paying him the legal interest of the money, and sixty dollars extra, for his trouble. Such an agreement could be no fraud upon the holder of the mortgage, if, as the appellant's counsel insists, *there were no unfair means used to prevent others from bidding at the sale.

[*158]

The respondents were not personally liable for the payment of the debt, although it was a lien on their farm. If the mortgagee choose to let it be bid in by them, or by any one in their behalf, for less than its real value, they were perfectly justifiable in procuring some one to bid it off for them. If, on the other hand, the defendant represented truly at the sale, and to several of the witnesses at other times, that the holder of the mortgage had agreed it might go for $1,500, if it was bid off for the Lynches, they were perfectly justifiable in taking any means in their power to prevent other persons from bidding over that sum for the property. In either case they had an interest in the premises which they had a right to protect and preserve; and it would have been a gross fraud for any one to hold out to them, under such circumstances, that he was bidding off the property for their benefit, when he in fact intended to

1828.

Brown
v.
Lynch.

appropriate it to his own use.　If the appellant did in fact bid it off for them, under the agreement, he held it in trust for them, and had no other interest in it than that of a mortgagee, to secure the repayment of the purchase-money, and the $60, agreed to be paid him for his trouble.　(*Boyd* v. *McLean*, 1 John. Ch. R. 582.)　But if he had no such intention, and did not in fact bid off the property in trust for them, he was guilty of a fraud which this court will relieve against.　The cases referred to by the circuit judge fully establish the principle, that this court has power to relieve against such fraud ; and the means to be employed, is to convert the person who has gained an advantage by means of his fraudulent act, into a trustee for those who have been injured thereby.[1]

　There is no ground for the objection that the respondents have rescinded the agreement since the sale.　After they ascertained that the appellant intended to defraud them of their property, they did indeed endeavor to induce him to give it up, by circulating reports prejudicial to the title. The leases insisted on by him were executed under the advice of their neighbor, without any intention on their part to relinquish their right ; and there was nothing in that transaction *which could bar their remedy.　The supposition, that they ever intended to give up their right to redeem the premises on account of any defect of title, is contradicted by the fact that at the time they were making those declarations they were in pursuit of Brown to tender him the money, and he was keeping out of the way to avoid them.

[*159]

　I am satisfied the respondents were entitled to the relief claimed by their bill, and the appellant's counsel, on the argument, waived all objection to the particular form in which the relief was given, by decreeing the payment of the profits made by the sale of the land to Coulter, instead of decreeing a reconveyance.　The decree of the equity court must therefore be affirmed with costs.

[1] *Flagg* v. *Mann*, 3 Sumner, 486 ; *Allen* v. *McPherson*, 1 Phil. 133 ; 5 Beav. 469 ; S. C., 1 H. L. Ca. 191 ; Hill on Trustees, 144, n.