Warner *v.* Blakeman.

The judgment should be affirmed.

[Dutchess General Term, May 12, 1862. *Emott, Brown, Scrugham* and *Lott,* Justices.]

## WARNER and LOOP *vs.* BLAKEMAN and others.

A regular foreclosure by advertisement under the statute, of a mortgage which has in fact been paid before foreclosure, but not satisfied of record, and the sale made in pursuance thereof to a *bona fide* purchaser, is equivalent to a sale under a decree in equity; and is an entire bar of all claim of any person having a lien by judgment subsequent to the mortgage, who shall have been duly served with notice of sale.

The mortgagor and his assigns may impeach such a sale by showing that the proper statutory proceedings have not been taken to render the foreclosure effectual; but they cannot, after being served with notice of sale, go further and show that the mortgage was fraudulently foreclosed after having been paid, and thereby defeat the title of a subsequent *bona fide* purchaser of the mortgaged premises.

The cases of *Wood* v. *Colvin,* (2 *Hill,* 256,) and *Cameron* v. *Erwin,* (5 *id.* 272,) commented upon and explained, and some of the dicta of Judge Cowen, in the latter case, overruled.

Intermediate judgment creditors, although served with notice of sale, may, within six years after discovery of the fraud, come into a court of equity to set it aside; but the court, in setting it aside, will protect subsequent purchasers who, without notice of the fraud, have advanced their money upon the faith of a regular statutory foreclosure of the mortgage.

Where the mortgagee, in possession of the mortgaged premises, purchases in the premises, and as part of the consideration of such purchase cancels the mortgage debt, he is entitled to protection as against judgment creditors, who become such after the execution of the mortgage.

The delivery up of the bond and mortgage, to the mortgagor, in such a case, to be canceled, does not deprive the mortgagee of his prior lien upon the premises to the full extent of the mortgage debt.

THIS action was commenced on the 28th day of November, 1859, by the above named plaintiffs, against the defendants, to set aside two mortgages and the forceclosure of one of them, and subsequent conveyances and contracts for the sale of parts of said mortgaged premises, on the ground that the said first two mortgages had been fully paid and satisfied prior to said foreclosure, and that said foreclosure and sale of the premises were fraudulent and void as to the plaintiffs, they being judgment creditors of the mortgagor.

The pleadings are sufficiently stated in the opinion of the court.

On or about the 3d day of April, 1848, Robert Turner and wife, and Samuel C. Turner and wife, executed a mortgage to Eben Blakeman to secure the sum of $1200 and interest, upon a certain woolen factory, dwelling house and lot, situate at Munnsville, Madison county, acknowledged the same day, and recorded in Madison county clerk's office, 6th April, 1848.

The referee then finds that Robert Turner, being in possession as owner on the 30th of April, 1852, executed and delivered to Hiram Whedon a mortgage on this same property for $3000, payable on the face of it in one year with interest. Whedon at the same time signed and delivered to Turner a separate instrument in writing, specifying that the mortgage was given to secure Whedon for Turner's indebtedness to him, and for indorsing a bank note, and for further contemplated indebtedness by Turner to him for goods to be sold, and for Whedon's agreeing to indorse sundry other notes for Turner; and that when Turner should pay such obligations and demands, saving Whedon from all harm or loss, then the mortgage was to be returned to Turner.

This stipulation was never recorded.

Warner *v.* Blakeman.

On the 1st day of April, 1853, Turner and Whedon had a settlement, in which Whedon's account against Turner was found to be $1246.08, and Turner's credit was found to be $103.87, leaving a balance, for which Turner gave his note, of $1143.21, and leaving also a balance on last settlement unpaid of $432.26, making in all the sum of $1575.47.

On the 10th day of March, 1853, Warner and Loop, the plaintiffs in this action, obtained a judgment for $1326.76 against Robert Turner and Sandford Turner, the roll being filed in the city and county of New York, and a transcript duly filed and docketed in Madison county clerk's office on the 14th day of March, 1853. Soon after, an execution was issued and delivered to the sheriff of Madison county, but no property could be found by the sheriff, and nothing was ever collected on the execution, which was lost, and now remains unsatisfied, and the whole amount of the judgment is still due the plaintiffs. In December, 1853, or January, 1854, the factory was destroyed by fire, still leaving the aforesaid incumbrance upon it.

On the 17th day of February, 1854, Robert Turner had become still further indebted to Whedon, in about the sum of $900, and having lost his factory by fire, had become insolvent, and so much embarrassed in his business that he contemplated making an assignment, if he could not obtain pecuniary aid, and in order to relieve him, the following arrangements were on that day made between him and Whedon and Eben Blakeman, viz: Blakeman sold Turner a farm of 70 acres, then owned by him in Cazenovia, at the sum of $4300, subject to a mortgage on it of $800. This farm, in the same arrangement, was sold by Turner to Whedon for the same sum, Whedon taking the conveyance directly from Blakeman, subject to the $800 mortgage, and undertaking to account with Turner for the $4300. At the same time Whedon pur-

chased of Turner one fourth of a new factory built on other
lands, but not finished, at . . . . . . . . . $2,125 00
The net value of the farm sold by Turner as
    stated, is . . . . . . . . . . . . . . .   4,300 00
                                              ————————
Property transferred or sold by Turner to Whedon,
    towards satisfying Turner's debts to Whedon, $6,425 00
                                              ════════

On this arrangement of February 17, 1854, con-
    veying the farm, Whedon was to pay Blakeman
    for Turner $1000. Whedon had advanced to
    and had become liable for Turner, . . . . $7,511 36
From which deduct price of farm and one quarter
    of factory as above, . . . . . . . . . .   6,425 00
                                              ————————
Leaving a balance still in Whedon's favor of . $1,086 37
and which was found on subsequent settlement, made April
1st, 1854, to have increased to $1154.27.

In the arrangement of February 17, 1854, this $3000
mortgage was not canceled, but Whedon was to take the per-
sonal responsibility of Turner for the balance then left due
him, and the mortgage was then, at the request of Turner
and Blakeman, assigned by Whedon to Blakeman.

This assignment was by a writing indorsed on the back of
it, expressing a consideration therefor of $1000. Blakeman
was to pay this consideration of the assignment to Turner in
pine lumber owned by him in Lewis county. Nothing was
paid by Blakeman to Whedon on this assignment, nor was
any part of Turner's liability or indebtedness to Whedon
assigned to Blakeman.

At the time of this arrangement between Turner, Whedon
and Blakeman, on the 17th of February, 1854, the farm was
counted to Turner, from Blakeman, at . . . $4,300 00
Turner was indebted to Blakeman, as shown by a
    settlement made a few days after—Feb. 26, '54,  1,370 11
                                              ————————
                                               $5,670 11
                                              ════════

| | | |
|---|---:|---:|
| Blakeman bought of Turner one quarter of the factory at . . . | $1,875 00 | |
| Whedon was to pay Blakeman for Turner, . . . . . . . . | 1,000 00 | |
| Blakeman had an assignment of insurance money, . . . . . | 2,138 00 | |
| There were several indorsements on the $1200 mortgage, which it was agreed should apply towards the farm, amounting in the aggregate to . . . . . . . | 740 00 | |
| Leaving the full face of the $1200 mortgage due as by this agreement, . . . . . . | | 5,653 00 |
| And leaving a balance to be adjusted between them of . . . . . . . . . . . . . . | | $17 11 |

When this transaction of February 17, 1854, was consummated, it was considered and understood by the parties that Turner owed Blakeman on the $1200 mortgage—

Of principal, . . . . . . . . . . . . . . . $1,200 00
Interest on ditto to April 19, 1854, six years and
  sixteen days, . . . . . . . . . . . . . 527 67
On the $3000 mortgage to be paid in lumber, . 1,000 00

The defendant Blakeman produced the following receipts:

"This certifies, that Robert Turner has applied all the money which he did pay to Eben Blakeman to apply on his mortgages, and likewise the money which said Blakeman received of the Madison Co. Insurance Company as payment towards the farm which said Blakeman sold to said Turner, which will leave the mortgage all clear from any indorsement, and all due to Eben Blakeman or his heirs or assigns.

Stockbridge, March 1st, 1854.    ROBERT TURNER."

"Rec'd of Eben Blakeman the full amount of insurance

which he received of the Madison County Insurance Company for me.   Stockbridge, July 26th, 1854.

ROBERT TURNER."

The referee also finds, that in November, 1854, Robert Turner and wife executed and delivered to Eben Blakeman a warranty deed of the premises covered by these mortgages, expressing a consideration received of $2000.

The following exhibits were also produced:

" Deed from Robert Turner and wife to Eben Blakeman, dated November 18th, 1854.   Consideration expressed in deed, $2000.   The following is a part of said deed, in words and figures: ' The above premises are conveyed subject to a mortgage executed to Eben Blakeman, April 3d, 1848, principal $1200 dollars; also to a mortgage executed to Hiram Whedon, April 30th, 1853, of $3000.'   The said deed contains a clause of warranty as follows: That the said parties of the first part will ' warrant and defend against any person claiming under them;' the words, ' against any person whomsoever lawfully claiming the same, or any part thereof,' having been erased before execution.

The said deed was acknowledged the 18th day of November, 1854, and was recorded November 20th, 1854, and covers the dwelling house and lot and factory site, also covered by the $3000 and $1200 mortgages."

" Affidavits of foreclosure sale, recorded May 15, 1855. Sale made 17th March, 1855.   Publication commenced 16th December, 1854, and terminating 10th March, 1855."

" Mortgage for $3000, from Robert Turner and wife to Hiram Whedon, executed 30th April, 1852, acknowledged 13th May, 1852.   Assigned to Eben Blakeman 17th February, 1854; consideration expressed in assignment, $1000; assignment acknowledged 27th November, 1854, before Shubael Keyes, justice.

For and in consideration of the sum of $1000, to me in hand paid by ———, of Stockbride, Madison county, the

receipt whereof is hereby confessed, have bargained, sold and assigned to said ————, all my right, title, claims and interest to and in the within mortgage.     EBEN BLAKEMAN."

The above assignment erased by black ink lines drawn across it, and the name of " Eben Blakeman" at the bottom also erased when exhibited.

The referee then finds as follows :

In the fall of 1854, Blakeman delivered this $3000 mortgage to Robert Turner, with an assignment executed by him and indorsed on the back of it with a blank left for the name of the assignee, for the purpose of enabling Turner to use it as his own in obtaining a loan of money, or in securing debts owing by him, and Turner endeavored to use it for that purpose but without success ; and the $1200 mortgage and the bond accompanying the same was at the same time delivered by Blakeman to Turner for a like purpose.    After these mortgages were delivered to Turner and in his hands, Blakeman, in seeking to obtain a title to the premises, obtained from Robert Turner and wife the deed before mentioned, which was executed and delivered to Blakeman on the 18th day of November, 1854, and received by Blakeman on condition that it would give him a good title, and he carried it to the clerk's office of Madison county and had it recorded on the 20th day of November, 1854, the premises being worth at that time $1200, and no more.

After his return from the clerk's office, Blakeman was reminded of the existence of the Warner and Loop judgment, and having received a redelivery of the two mortgages from Turner, leaving the bond given with the $1200 mortgage in his hands, procured an acknowledgment, on the 27th day of November, 1854, from Whedon, of the assignment to him, and had it and the mortgage recorded in the clerk's office of Madison county on the 28th of November, 1854.

Having done this, Blakeman then proceeded to foreclose the $3000 mortgage by advertisement under the statute, claiming as due thereon $2626.25, and on the 17th day of

March, 1855, sold, and himself became the purchaser of, the premises on such foreclosure sale for the sum of $800, and then entered into possession and claimed to have obtained a valid title under such sale. A copy of the advertisement or notice of mortgage sale was duly served on Warner and Loop, the plaintiffs in this action.

At the time of the foreclosure of the $3000 mortgage by Blakeman, the plaintiffs in this action had no knowledge of the existence of the writing or agreement made by Whedon in connection with that mortgage and delivered to Turner, showing what that mortgage was given for ; nor had they any knowledge of the facts or previous dealings between Whedon and Turner tending to show that the full consideration had been furnished by Whedon and repaid by Turner, or that said mortgage was discharged, or was any other than a valid subsisting lien upon the premises covered by it. And it was not until within six years prior to the commencement of this action, that they became possessed of any such knowledge.

On the 11th of February, 1856, Eben Blakeman and wife conveyed by warranty deed to the defendant Daniel P. Price that portion of said premises, as alleged and described in the plaintiffs' complaint in this action ; and on the 12th of February, 1856, they also conveyed to the defendant Richard Brooks that portion of said premises as alleged and described in the said complaint; and that said Blakeman, before the commencement of this action, sold by contract to the defendants James Bright and Andrew Wylie that portion of said premises, as described and set forth in said complaint ; and that said defendants Price, Brooks, Bright and Wylie entered into and are now in possession of said premises so purchased by them respectively, as stated in the plaintiffs' complaint.

The following are the conclusions of law, as found and reported by the referee : 1. That the $3000 mortgage executed by Robert Turner and wife to Hiram Whedon, on the 30th day of April, 1852, was in its inception a valid instru-

ment, and constituted a lien upon the premises therein described, for the security of Turner's existing indebtedness to Whedon, and for such further indebtedness as should accrue by reason of advances or credits on Whedon's part to Turner, and such liabilities as Whedon should thereafter assume to pay as indorser or surety for Turner, to an amount in the aggregate not exceeding $3000. (Exception.)

2. The plaintiffs in this action having no knowledge, at the time of the foreclosure of the $3000 mortgage, of the facts tending to invalidate or show that the lien of these mortgages had ceased, are not precluded by reason of notice of such mortgage sale, from afterwards seeking equitable relief in this action. (Exception.)

3. If these mortgages, or either of them, were a valid or subsisting lien on the premises, at the time of giving the deed to Blakeman by Turner and wife, of the equity of redemption in the premises, such deed having been received on the express condition of its securing a good title, was not a merger of these mortgages thereon.

4. That Whedon having, previous to the assignment of the $3000 mortgage to Blakeman, sold to Turner property, and advanced to him money, and become liable to pay, and subsequently did pay, as surety for Turner, a sum in the aggregate much larger than the amount for which the mortgage was given, and Turner having at or previous to such assignment sold to Whedon property towards the liquidation thereof to a much larger amount than the sum for which the mortgage was given, although still leaving a considerable balance due Whedon, yet the mortgage thereby became *functus officio,* and the lien created thereby ceased and became extinct as against the plaintiffs in this action, they having become judgment creditors, whose liens had intervened. (Exception.)

5. This $3000 mortgage having been given to secure Whedon for his debts against, and personal liabilities as security for, Turner, and Turner having reduced such liabilities so far

that Whedon gave up the mortgage and assigned it for the use of Turner, and instead thereof took Turner's personal responsibility for the balance in his favor, was a fulfillment of its design, and it could not be held by Blakeman as against judgment creditors with intervening equities, to perform another office by securing an entirely different contract or debt, although the parties might have supposed it would have that effect. (Exception.)

6. If the $3000 mortgage was a valid subsisting lien for any amount after the assignment from Whedon to Blakeman, such lien had been reduced to $1000, the amount which constituted the consideration for the assignment thereof, and this amount being subsequently so far liquidated by the transactions and state of deal between Turner and Blakeman that Blakeman delivered up the mortgage to Turner, to be used by him as his own in raising money or securing his debts, was a relinquishment of all remaining lien, if any, and a surrender of the security. (Exception.)

7. The $1200 mortgage having been reduced $750 by payment actually made thereon, its lien to that extent was thereby reduced, and could not again be restored by the parties, so as to operate to the prejudice of other liens which had attached.

*And the subsequent surrender of the mortgage by Blakeman to Turner, to be used by him as his own in raising money or in securing debts, and the bond accompanying the same still being held by Turner, opens a door through which the intervening judgment creditors enter with a paramount lien ;* and the former lien of the $3000 mortgage having been spent while in the hands of Whedon, and then turned over or assigned to Blakeman for Turner's use, and having been surrendered to Turner by Blakeman, to be for a third time used or negotiated by. Turner, no longer constitutes a lien, *and the power of sale being extinguished, the foreclosure and sale of the property covered by it was a nullity, and conferred no title on the purchaser ; and the conveyance*

Warner *v.* Blakeman.

*from Blakeman and wife to the defendants Price and Brooks conferred on them no title, nor can they give a title to Bright and Wylie.* (Exception.)

8. The referee found and directed " that the plaintiffs in this action have judgment therein; and that as to said plaintiffs all proceedings in the aforesaid foreclosure of said $3000 mortgage and the sale of the premises thereon to Eben Blakeman, and all subsequent conveyances by him made to others, defendants in this action, or either of them, and all title derived under such mortgage foreclosure sale, be set aside, and adjudged and declared null and void; and that both the said $3000 mortgage and the said $1200 mortgage be adjudged and declared satisfied and canceled, and that the plaintiffs recover their costs and disbursements in this action. (Exception.)

. The defendants requested the referee to find as a conclusion of law as follows: That Price and Brooks having purchased portions of the premises covered by the said $3000 mortgage from Blakeman and wife in good faith and without having any knowledge or notice of any of the facts or circumstances invalidating said $3000 mortgage, or the sale under it, or said Blakeman's conveyance as against the plaintiffs, the conveyance of said Blakeman and wife to them is valid and legal, and transferred the title to them in their respective portions of said premises, and being innocent purchasers in good faith, they ought not to be charged with any costs or expenses of said action.

The referee refused to find as requested, and the defendants excepted.

*W. H. Kinney, F. Kernan* and *H. T. Jenkins,* for the appellants.

*N. Foote,* for the respondents.

*By the Court,* MORGAN, J. The plaintiffs are judgment creditors of Sandford Turner and Robert Turner, and the

defendant Blakeman went into possession of certain lands which he purchased of Robert Turner, upon which the judgment was a lien, and which probably once belonged to Robert and Sandford, although the case does not in express terms so find.

It would appear from the pleadings and evidence, as well as the findings of fact by the referee, that Blakeman, before the commencement of this suit, conveyed or contracted away the premises in question, in different parcels, to Daniel P. Price, to Richard Brooks, and to James Bright and Andrew Wylie, who are in possession and are made parties defendants.

The premises consist of what was once a valuable factory and site; but the factory was burned down, and the value of lands is estimated at the present time at only $1200. Blakeman went into possession under a warranty deed from Robert Turner and wife, November 18, 1854, expressed to be for the consideration of $2000; but he took the conveyance subject to a mortgage executed to Eben Blakeman, April 3, 1848, (by Robert and Sandford Turner,) principal, $1200; also to a mortgage executed (by Robert Turner) to Hiram Whedon, April 30, 1853, of $3000, covering the same premises.

On the 17th February, 1854, this $3000 mortgage was formally assigned by Whedon to Blakeman, expressed to be in consideration of $1000; and on the 16th day of December, 1854, he commenced a foreclosure of it by advertisement under the statute, claiming that there was due thereon and unpaid the sum of $2626.25; and on the 17th day of March, 1855, the premises were bid in by Blakeman for $800. Notices of this foreclosure were duly served upon the plaintiffs. One object of the complaint is to set aside this sale and cancel the mortgage, on the ground that it was satisfied before foreclosure, and that the foreclosure was a fraud upon the judgment creditors of Robert Turner. It is also claimed in the complaint that the $1200 mortgage has been paid and satisfied, and the complaint also seeks to cancel that. The

complaint also seeks to set aside the conveyances and contracts of Blakeman to the defendants Price, Brooks, and Bright and Wylie. Price purchased half an acre for $800, and received a warranty deed from Blakeman and wife, February 11, 1856. It would appear that he paid down $150, and to secure the balance executed back a mortgage for $650. How much remained unpaid at the time of the commencement of this suit does not appear. And on the 12th day of February, 1856, Blakeman conveyed to Richard Brooks by warranty deed half an acre of the premises for the consideration of $300. It would appear that he paid Blakeman $50 down, at the time, and to secure the balance gave his mortgage to Blakeman for $250. And it is stated in the complaint that Blakeman, after the foreclosure of the $3000 mortgage, sold the residue of the premises to James Bright and Andrew Wylie, by a written contract of sale. The price is not stated, although it is stated that a portion of the consideration remains unpaid. It further appears that they went into possession under the contract of sale, and will be entitled to a deed on payment of the balance of the purchase price.

These defendants all join in the answer, and attempt to sustain the statute foreclosure of the $3000 mortgage, although Bright and Wylie deny that they are entitled to a deed. (Probably they have one.) Price, Brooks, Bright and Wylie admit that they purchased separate parcels of said premises from Blakeman and wife, as set forth in the complaint, but aver that they made such purchase in good faith and for sufficient consideration, and that Blakeman conveyed to each of them a complete and perfect title to said premises.

It is not alleged in the complaint, nor is it found by the referee, that they had notice of the facts which are relied upon to avoid the statute foreclosure of the $3000 mortgage. The referee, however, ordered judgment for the plaintiffs, directing these conveyances to be set aside, and they are adjudged and decreed to be null and void. The judgment also

sets aside the $3000 mortgage and the $1200 mortgage, and all the proceedings upon the statute foreclosure, but does not interfere with the deed from Robert Turner to Blakeman, of November 18, 1854.

Without doubt, the facts found by the referee fully justified the conclusion that, as to creditors having a lien on the premises, the $3000 mortgage was *functus officio*, and that its subsequent foreclosure by Blakeman was a fraud upon creditors who had intermediate liens.

And as the plaintiffs have no knowledge of the facts which rendered it inoperative at the time of the statute foreclosure, they are not concluded by it, but may, at any time within six years after the discovery of the fraud, institute a suit to set aside the sale. But the necessity which they are under to come into a court of equity to set aside the sale, presupposes that the sale is valid until it is set aside. (21 *How. U. S. Rep.* 497, *Catron, J.*)

There is no defect in the chain of title as it appears upon the record. But outside of the record, it appears that the mortgage, which was foreclosed, was subject to a condition which rendered it inoperative as against judgment creditors and subsequent purchasers without notice.

The parties to the mortgage cannot complain, as they consented that it might be held as security for Turner's indebtedness to Blakeman. They would be estopped from complaining of the foreclosure, if they had assented to it, with a knowledge of all the circumstances.

The referee, however, must have decided that subsequent purchasers *in good faith* could not claim protection under such a foreclosure, but that they stood in the shoes of Blakeman and must abide by his title ; not, however, because the defect in his title was matter of record, for it was not, but because the mortgage was *defunct* as a security when the sale took place.

In my opinion, the proposition of the learned referee cannot be sustained. There was at least an apparent authority

for the foreclosure and sale.   The mortgage was kept on foot by the parties to it, so that as to them, subsequent purchasers would have acquired a good title.

By the foreclosure in this case, the plaintiffs' lien upon the equity of redemption was cut off at law so far as the record spoke; and there is no reason why this court should disturb a subsequent *bona fide* purchaser, because it is made to appear that the claim, secured by the mortgage, was in fact satisfied before the foreclosure.

A subsequent purchaser has at least as strong a claim upon the equity of the court as the judgment creditor has by his general lien.   The lien of the judgment is general and not specific, and is not even notice to a prior purchaser so as to overreach payments subsequent to the judgment.   (*Moyer* v. *Hinman*, 13 *N. Y. Rep.* 180.)   But it is notice to subsequent purchasers, and although not a specific lien, may be enforced by execution.   Here, however, the judgment lien is cut off by the record; for when we look at that, we find that a foreclosure and sale, regular in form, has taken place by which the creditors are barred of all equity of redemption. For a regular foreclosure by advertisement, and the sale made in pursuance thereof to a *bona fide* purchaser, is equivalent to a sale under a decree in equity, and is an entire bar of all claim of any person having a lien by judgment subsequent to the mortgage, who shall have been served with notice of sale. (2 *R. S.* 546, § 8, *as amended in* 1844, *ch.* 346, § 4.)

And the affidavits of such foreclosure, sale and notice, are presumptive evidence of the facts therein contained.   (§ 12.) And it is further provided, that when the mortgagee or his assigns are the purchasers, these affidavits shall be evidence of the sale and foreclosure of the equity of redemption, in the same manner and with the like effect as a conveyance executed by the mortgagee upon such sale to a third person. (§ 4.)   The record title in this case was therefore perfect, and in a suit at law would enable the defendants Brooks, Price, Bright and Wylie to recover the premises against all

the parties to the statute foreclosure who had been served with notice. The affidavits are a statute conveyance, (27 *Barb.* 503,) and when they perform that office, the purchaser can no more impeach them, by parol evidence, than he could a conveyance by deed. (Bronson, Ch. J., in *Arnot* v. *Mc-Clure,* 4 *Denio,* 45.) But it is said the mortgagor and those claiming under him may impeach the sale. (*Id.* 44.) This can only mean that the mortgagor and those claiming under him may controvert the facts stated in the affidavits of sale. But here is no contradiction of any of the facts stated in these affidavits. *Blakeman,* it is true, *claimed* that there was a certain sum due upon the mortgage. But the proof is not offered to show that he did not *claim* it. It goes further, and shows that such *claim* was fraudulent as to the plaintiffs. So the case comes to this: that the statute conveyance is sufficient in form to pass a good title as against these plaintiffs; but outside of this is a matter which, when brought to the attention of the court, renders the sale fraudulent as to the plaintiffs. What is this outside matter, more than what appears in the case of a voluntary conveyance given to defraud creditors, or a conveyance by executors in fraud of an estate. *Bona fide* purchasers in all such cases are entitled to protection. It is not an answer to say that Blakeman took no valid title under the mortgage foreclosure, as against the judgment creditors. His title was not absolutely void, but it must be considered good as to the mortgagor who assented to it.

In *Jackson* v. *Henry,* (10 *John.* 185,) the power of sale in a mortgage was shown to be void, on account of usury in the original debt, (the statute declaring the usurious security utterly void,) yet it was decided that a foreclosure and sale under the statute could not be defeated in that way, to the prejudice of a *bona fide* purchaser.

The referee probably relied upon the cases of *Wood* v. *Colvin,* (2 *Hill,* 566,) and *Cameron* v. *Irwin,* (5 *id.* 272.)

In the first of these cases, Judge Bronson expressed an

Warner *v.* Blakeman.

opinion that a *bona fide purchaser* would not be protected when the sale was made upon a judgment that was satisfied. This was asserted upon the technical theory that there is no longer any power to sell, yet he admits that if there has *been some fault* on the part of the judgment debtor, he may be estopped afterwards from alleging the payment to defeat the title of the purchaser. In the case before him, there was no *bona fide purchaser*, and what is said about the rights of *bona fide* purchasers in certain cases does not control this court, as authority.

But the case of *Cameron* v. *Erwin* is entitled to a more critical examination. It was there said, by Cowen, J., (although not necessary to the decision of the question before the court,) that payment of a mortgage extinguishes the power of sale contained in it, and if a statute foreclosure afterwards takes place, even a *bona fide purchaser* at the sale will acquire no title. The point actually decided was, that the assignee of the mortgage, when he became the purchaser at the sale, acquired no title.

This proposition is doubtless correct, for the simple reason that the assignee is in no better position than his assignor, and must abide by his title. At least, he is liable to all the equities of the mortgagor, though it would seem that he is not to be affected by mere outside equities residing in third persons, of which he has no notice. (2 *John. Ch. R.* 441, 479. 2 *Cowen,* 246, 298. 4 *Seld.* 273, *Johnson, J.*) But it is said by Cowen, J. in *Cameron* v. *Irwin,* that payment extinguishes the power of sale, and the case becomes the same as if none had ever been inserted in the mortgage, and that the mortgage "ceases to operate either at law or in equity, and the whole title reverts in the mortgagor." * * * "To call it a mortgage would be an abuse of the word. It is no more than a blank. It cannot be that a naked foreclosure by advertisement shall take away a man's farm." All this would be the undeniable conclusion, if the mortgagor was in a position to dispute the sale. It certainly is not true, when the

mortgagor looks on, and without objection, sees his farm sold to a *bona fide* purchaser under a written power of sale in a mortgage which he knows is satisfied. Nor can the mortgagor be heard to allege payment of the mortgage when he has consented to its foreclosure. If, however, the foreclosure takes place without notice to him, or without his fault, after payment of the mortgage debt, the rule would doubtless be applied as rigidly as contended for by the learned judge in *Cameron* v. *Irwin.*

The statute regulating such sales has however been careful to require notice to be given to the mortgagor, and to all persons having any subsequent title to or lien upon the mortgaged premises. The object of the statute is apparent. And I think that after due notice to claimants, as required by statute, they cannot be heard to contest a regular sale, as against *bona fide* purchasers of the mortgaged premises. If they have any claim in equity superior to the title of the mortgage, which would invalidate the proceedings, they are in duty bound to assert it before the premises are conveyed to a *bona fide* purchaser. Unless we require them to speak when called upon by this notice, and assert their claims, the notice itself would be an idle ceremony, and no one would dare to bid at the sale.

We must therefore hold that persons thus having notice are estopped at law from disputing the validity of the mortgage as against *bona fide* purchasers. And it follows that notwithstanding the mortgage has been in fact paid, the mortgagor, having due notice of the foreclosure, cannot afterwards upset the title of a *bona fide* purchaser at the sale, by proving payment of the mortgage debt. To allow him to do this, would be a fraud upon subsequent purchasers, who had bought the mortgaged premises upon the faith of the mortgage and the default of the mortgagor to assert his claim. It is not a good answer to say that these statutory proceedings are not in court, and that the mortgagor is not required to contest them. The notice of such proceedings, with a claim

against him for a certain amount due upon the mortgage, at least imposes upon him the duty of notifying purchasers at the sale, of his claim, or the duty of silence afterwards.

If he will not speak when duty toward others requires it, he will not be permitted to speak afterwards, when his interest prompts him to it. It cannot therefore be said that the title of the purchaser is absolutely void, because the mortgage was satisfied before the foreclosure. The parties to the power of sale, after it is extinguished by payment of the mortgage, still hold it out to the world as a valid power, and consent that the mortgaged premises may be sold under it. As to them, it will be held valid by way of estoppel, as was admitted by the judge who delivered the opinion in *Wood* v. *Colvin.* (*See* 12 *Barb.* 20, 21, *Willard, J.; S. C.,* 5 *Selden,* 45.)

Chief Justice Spencer, in *Anderson* v. *Roberts,* (18 *John.* 527,) says : "No deed can be pronounced in a legal sense utterly void, which is valid as to some persons but may be avoided at the election of others. (*And see authorities cited by him.*) The decisions in 2 *Selden,* 147 and 449, are not opposed to this view of the case. The question then is narrowed down to one between two innocent parties, who have been defrauded by keeping the mortgage along as a valid security after it was paid. Although the plaintiffs were notified of the sale, they were ignorant of the fraud. As to them the sale was fraudulent and void ; but the court will not disturb the title of a *bona fide* purchaser, in favor of the claim of a junior creditor to upset the sale on the ground of fraud.

The defendants *Brooks, Price, Bright* and *Wylie* purchased of the fraudulent grantee under the mortgage, and the fraudulent conveyance not being absolutely void, but only voidable at the instance of the party aggrieved, they are entitled to protection as *bona fide* purchasers, so far as they have paid the purchase money. (14 *John.* 407. 10 *id.* 185. 18 *id.* 515. *And see* 39 *Maine Rep.* 467.)

The plaintiffs, not having sold the premises under their

execution, but having a new lien, are not in a condition to contest the equities of the subsequent purchasers from the fraudulent grantee.

If these plaintiffs had sold under their execution against the mortgagor before the subsequent conveyance from the fraudulent grantee, they might have prevailed instead of the defendants, for the reason that when two persons have equal equities, the maxim applies, *qui prior est in tempore potior est in jure.* (18 *John.* 515, 532.) Although this might depend upon the priority of conveyances as recorded. (9 *Paige,* 132.)

If the case stopped here the judgment might be modified by turning Blakeman into a trustee, and requiring him to account to these creditors for the proceeds of the sale to Price, Brooks, Bright and Wylie. (1 *Paige,* 147. *Story's Eq. Jur.* 395, § 1265.)

The next question is as to the $1200 mortgage. If that was in fact paid, then there is no difficulty in sustaining the judgment so far as it requires its cancellation. But if it has not been paid, or even if it was satisfied by the conveyance of the mortgaged premises to Blakeman, the amount due upon it at the time is a valid lien upon the premises as to these plaintiffs, and must be allowed to him.

Whether it is regarded as a lien, or whether as a mere lien it is extinguished by his purchase of the equity of redemption of the mortgagor, the same result follows. The lien in one case, or the consideration of the purchase in the other case, to the extent of the lien, entitle him to protection against judgment creditors, who became such after the execution of the mortgage. Blakeman may doubtless be treated as a mortgagee in possession, and after retaining sufficient to pay the mortgage debt, he might be required to account to the creditors for the proceeds of the premises beyond that amount. The question then becomes an important one, whether the $1200 mortgage was paid by the mortgagor, except by way of purchase of the mortgaged premises.

As to the indorsements upon this mortgage of $741 which had been paid before the plaintiffs' judgment, the arrangement of February 17, 1854, to cancel them and apply the payments to the purchase of a farm in Cazenovia, was inoperative as to the plaintiffs. The learned referee was doubtless right in holding that the lien of the mortgage, as to this $741, could not be revived by the agreement of the mortgagor and the mortgagee, as to third persons who held *bona fide* incumbrances upon the mortgaged premises. (*Marvin* v. *Vedder*, 5 *Cowen*, 671.) It is more difficult to see how the balance was paid. One way in which it is suggested that payment took place, was the assignment of the insurance policy as collateral security, and the receipt by Blakeman of the insurance money after the destruction of the factory by fire. By a receipt of March 1, 1854, Robert Turner certifies that all this insurance money was applied toward the purchase price of the Cazenovia farm, which Turner bought of Blakeman, and that the indorsements which Turner paid to apply on this mortgage had been diverted to the same object, "which will leave the mortgage all clear from any indorsement, and all due to Eben Blakeman or his heirs or assigns." If the insurance money had been actually applied *prior* to this time to pay the mortgage, it must be regarded as satisfied as to these creditors. This receipt would seem to refer to the transaction of February 17, 1854. In that transaction, as found by the referee, the insurance money is stated at $2138, and *was actually applied* as stated in the receipt. (11th finding.)

The indorsements on the $1200 mortgage, amounting to $740, were also taken off from the mortgage and applied in the same way, "leaving (says the referee) the full face of the $1200 mortgage due as by this agreement."

There is some contradiction, but more confusion, in the evidence, as to the actual application of this insurance money to pay the $1200 mortgage. It would seem that the policy was assigned to Blakeman as collateral security to pay the

mortgage, and that when the transaction of February 17, 1854, took place, the money had not been received by Blakeman. It was therefore competent for the parties to direct the application of the money, when received, to another purpose. And I am not satisfied from the evidence that there was any new arrangement after February 17, 1854, by which any portion of this insurance money was withdrawn from the purchase price of the Cazenovia farm and applied upon the mortgage. At all events, the referee does not find, as a matter of fact, that the insurance money was ever applied to pay this mortgage; and we ought not therefore to assume it upon contradictory evidence. The conclusion of the referee in his seventh finding of law is, that as the bond and mortgage was surrendered to Turner "to be used by him as his own in raising money or in securing debts, and the bond still being held by Turner, opens a door through which the intervening judgment creditors enter with a paramount lien."

The only facts found by the referee upon which this proposition is based, are that "in the fall of 1854 Blakeman delivered this $3000 mortgage to Robert Turner, with an assignment executed by him on the back of it, with a blank left for the name of the assignee, for the purpose of enabling Turner to use it as his own in obtaining or in securing debts owing by him; and Turner endeavored to use it for that purpose, but without success; *and the $1200 mortgage and the bond accompanying the same, were at the same time delivered by Blakeman to Turner for a like purpose.*" (15th finding of fact.) And "after these mortgages were delivered and in his hands, Blakeman, in seeking to obtain a title to the premises, obtained from Robert Turner and wife the deed before mentioned, which was executed to Blakeman on the 18th day of November, 1854, and received by Blakeman on condition that it would give him a good title," (16th finding of fact;" but that after his return from the clerk's office to get it recorded, Blakeman was reminded of the plaintiff's judgment, "and having received a redelivery of the two

mortgages from Turner, leaving the bond given with the $1200 mortgage in his hands, procured an acknowledgment on the 27th day of November, 1854, from Whedon, of the assignment to him" of the $3000 mortgage, got it recorded and commenced a foreclosure on the latter. (17th and 18th findings of fact.)

The defendants' counsel requested the referee to find, among other things, that Robert Turner was indebted to Blakeman at the time of the purchase of said premises, on the foreclosure, about $1570, which is now unpaid. The referee refused to find it, although he leaves us in doubt whether he would not have found it, if he had thought it important.

It is therefore impossible to determine from the findings of fact that this $1200 mortgage was ever surrendered up to Turner because it was paid and satisfied.

It would be consistent with the relation of the parties to each other to suppose that the object was to enable Turner to raise money on the $3000 mortgage to pay the mortgage debt and other demands which it seems Blakeman held against him at the time. It would be unnecessary to negotiate the $1200 mortgage if Turner could have obtained a loan upon the $3000 mortgage; but it would be necessary, perhaps, for him to show that the prior $1200 mortgage was not in the way. Quite likely it was to be canceled in that event. Having failed in obtaining a loan, there does not seem to be any legal obstacle in the way of his redelivering both mortgages to Blakeman. And although the referee has not found upon the question, he might perhaps find that Blakeman took back the mortgages and concluded to take back the mortgaged premises in consideration of $2000, *and that part of the consideration was this very $1200 mortgage.* The bond in that case would be retained by the mortgagor; and this circumstance would be no evidence of the invalidity of the mortgage, which was retained, perhaps, to protect his title, and which he would have a right to use for that purpose to the extent of what was actually

due upon it, after deducting the $740 indorsements. (7 *Paige,* 509, 511.   2 *Allen* [*Mass.*] 390.)

The referee finds that Blakeman himself was not informed of the agreement under which the $3000 mortgage was executed.   The condition of the mortgage was to pay that sum, and the agreement that it was intended as security for advances, &c. was never put upon record.   He seems to have taken it to secure $1000, and to have taken it in good faith for that purpose.   He undertook to hold it as security for other moneys which Turner owed him, and to foreclose it to protect his title.   This he could not do.   (3 *Barb. Ch. Rep.* 293.)   While, therefore, subsequent *bona fide* purchasers at the sale must be protected against the claim of intermediate creditors, he is in the position of an assignee of the mortgage, and took nothing by his foreclosure, as to these plaintiffs, except the naked title.   But he is entitled to protection so far as the consideration of the deed from Turner and wife to him was made up from the moneys due and unpaid on the $1200 mortgage.   But we have not the facts before us upon which it would be safe to give a final judgment in this action. The plaintiffs are doubtless entitled to follow the subsequent conveyances to the extent of the unpaid purchase money, if they succeed in showing that the $1200 mortgage is satisfied; or to a portion of it, if they succeed in reducing the $1200 mortgage below the value of the premises.

If I am right in these views, it follows that the judgment must be reversed, and the cause sent back to the referee for further examination.   It will be necessary for the referee to ascertain whether or not the $1200 was in fact paid or satisfied before the purchase of the mortgaged premises by Blakeman, and if not, how much remained due and unpaid at that time.   He must also ascertain and determine what amount remained due and unpaid by the defendants Price, Brooks, Bright and Wylie, respectively, on their several purchases from Blakeman, at the time of the commencement of this action; provided it shall appear, as we have assumed, that they pur-

chased in good faith, and without knowledge or notice of the facts which rendered the foreclosure of the $3000 mortgage fraudulent as to these plaintiffs. And the plaintiffs will be entitled to a judgment declaring the foreclosure of the $3000 mortgage by Blakeman fraudulent as to them, and requiring Blakeman to account for the proceeds of the mortgaged premises and to assign to a receiver to be appointed, any securities which he may have for the unpaid purchase moneys growing out of the subsequent sales by him of the mortgaged premises. And the subsequent purchasers must account to the receiver for all moneys which were unpaid at the time of the commencement of this suit.

And after deducting the amount, if any, which shall be found due and unpaid to Blakeman upon the $1200 mortgage, the balance only can be recovered by the plaintiffs, to apply upon these judgments.

But if these plaintiffs are satisfied with a judgment requiring Blakeman to account for the proceeds of the sales of the mortgaged premises, judgment might be entered accordingly, and then he must be required to pay over to the receiver the gross avails of such sales, less the amount which may be found due upon the $1200 mortgage. The defendant Blakeman may perhaps be charged with costs; although this is not a matter of course, unless the referee is satisfied, upon the evidence, that he knew that the $3000 mortgage was satisfied when he foreclosed it. If he knowingly undertook to use it to perpetrate a fraud upon these creditors, he ought to bear the expense of the litigation.

No costs should be charged to the other defendants, as the case now appears.

The costs of this appeal should abide the event.

Bacon, J. concurred.    Mullin, J. dissented.

Judgment reversed, and new trial granted.

[Oneida General Term, January 7, 1862. *Allen, Mullin, Morgan* and *Bacon*, Justices.]