## SMITH *v.* MARSH.

CONVEYANCES—PAROL TRUST—STATUTE OF FRAUDS.

A voluntary conveyance, executed without fraud or mistake, and without any request by the grantee, between whom and the grantor no confidential relations existed, will not be set aside at the suit of the grantor, on the ground that it was given and accepted under a parol trust which has not been carried out.

MOORE, J., dissenting; being of the opinion that the deed was made in pursuance of a contract, the advantages of which defendants seek to retain while repudiating its obligations.

Appeal from Washtenaw; Kinne, J. Submitted June 5, 1902. (Docket No. 102.) Decided March 23, 1903.

Bill by Rebecca R. Smith against Mary Marsh, administratrix of the estate of Jane Lamb, deceased, James B. Lamb, Ellen Clifford, and Isabella Clifford, to set aside a deed. From a decree for complainant, defendants Lamb and Clifford appeal. Reversed.

Complainant and defendants are brother and sisters, the children of James and Mary Lamb, deceased. James and Mary lived in Canada, where James owned an extensive farm. He died some time prior to 1867. Jane and Rebecca were twins. After his death his estate was settled, and the property sold and converted into money. The defendants Isabella and Ellen released all their interest in the estate of their father to their mother. Jane and Rebecca, with their mother, came to Michigan, and purchased some land, the title to which was taken in Rebecca and Jane as tenants in common. That was sold, and the land here in controversy purchased; the title being conveyed to them in the same way. On September 11, 1897, complainant executed a warranty deed of her undivided one-half of these lands to her sister Jane, who died in September, 1899. The object of this bill is the annulment of that deed. The basis for the relief prayed is found in the following allegation in paragraph 4 of the bill:

" Your oratrix further shows that, upon the administration of the estate of her said father, she and the said deceased, Jane Lamb, received their portion of said estate; that they were twin sisters, and agreed to unite their property and to live together during the balance of their lives; that at that time your oratrix was married to said Robert Smith, and by the terms of said agreement the said Jane Lamb was to have a home in the family of your oratrix; and it was further agreed by and between your oratrix and the said Jane Lamb that the survivor of the two, as between your oratrix and the said Jane Lamb, should be entitled to the entire joint property of the said Jane Lamb and your oratrix; and it was further agreed by and between your oratrix and the said Jane Lamb that, in case your oratrix should die before the said Jane Lamb, then and in that case the said Jane Lamb should have the

use, income, and profit arising from said joint estate during her life, and at her death it should go to the children of your oratrix."

Paragraph 17 of the bill reads as follows:

"Your oratrix further shows that by reason of the fact that she was born first, and because of a certain superstitious belief that, as between twins, the one who was first born would first die, and by reason of the fact that your oratrix had, to a considerable extent, lost her health, your oratrix and the said Jane Lamb, so long as she lived, were of the opinion and belief that the said Jane Lamb would certainly survive your oratrix; that by reason thereof, and by reason of the agreement aforesaid, and in order to escape the expenses and cost of the administration of her estate, and to avoid, as far as possible, litigation over the settlement of her estate, your oratrix and the said Jane Lamb were always anxious, whenever your oratrix was in feeble health, that the title to the entire property should be in the name of Jane Lamb, and that therefore the conveyances from your oratrix to the said Jane Lamb in every instance were intended to operate simply as a will, and not as a conveyance; and therefore your oratrix avers and charges that the said paper purporting to be a deed, bearing date the 11th day of September, 1897, might and in justice and equity ought to be declared to operate as a will, and not as a conveyance of said property, and in justice and equity ought to be set aside and declared null and void.

"Your oratrix further shows and charges that said Jane Lamb was a stronger-minded person than your oratrix, and possessed great and unbounded influence over your oratrix; that a relation of trust and confidence, to the greatest possible extent, existed between your oratrix and said Jane Lamb; that your oratrix had the utmost confidence in her said sister, and suffered her, to a large extent, to manage and control their joint business affairs; that said Jane Lamb exerted great influence over your oratrix, and by reason of said relation of trust and confidence, and of her superstitious belief that she would certainly die first, and in reliance upon the promise aforesaid of her said sister that, in case your oratrix would deed her interest in said property to her said sister, she, the said Jane Lamb, would deed over said joint property to the children of your oratrix before her death, and by reason

of the further inducement held out to her by her said sister that by deeding said property to said Jane Lamb, and by said Jane Lamb to the children of your oratrix, all the expenses of administration would be saved, your oratrix was induced to make said deed last aforesaid; and your oratrix is advised and believes that by reason of the premises a trust resulted to your oratrix, and that by reason thereof the title to said lands ought by this court to be decreed to be vested in your oratrix.

"Your oratrix further avers and charges that the undivided one-half of the real estate mentioned in said deed from said William A. Benedict and wife to the said Jane Lamb and your oratrix is the property of your oratrix by virtue of purchase from said Benedict and wife. and that, under and by virtue of the conditions of the contract mentioned in paragraph 4 of said bill of complaint, the other one-half of said real estate is also the property of your oratrix, and that the undivided one-half of the personal property, stock, tools, farming implements, utensils, and all personal property mentioned in the paper purporting to be a deed, bearing date the 11th day of September, 1897, is the property of your oratrix by virtue of her original rights in said property, and that the other undivided one-half of said personal property, under and by virtue of the condition and provisions of the contract mentioned in paragraph 4 of this bill of complaint, is also equitably the property of your oratrix, and might and in justice ought to be so declared and decreed by this honorable court to be."

The bill prays that the deed may be set aside, and that the contract above set forth shall be declared to have been performed and kept by her, and that she be decreed to be the owner in fee of the undivided one-half of said land. The answer denies all the material allegations of the bill, and interposes the statute of frauds as a defense. Proofs were taken in open court, and the learned circuit judge granted the relief prayed.

Four witnesses were introduced by complainant, and gave testimony claimed to sustain the allegations in the bill, viz., her son, daughter, son-in-law, and the attorney who drew the deed in question. The son testified:

"She [Jane] said I would get what she had after her death, anyway, if I stayed there.     *     *     *

" *Q.* And it is. true that your aunt said to you, if you stayed there at home and worked on the farm, she would be responsible for your wages, and give you her farm when she got done with it?

"*A.* Yes, sir."

The daughter testified:

" *Q.* Did you know about their making a contract having an understanding and agreement what should be done with the property that was upon the farm?

"*A.* Yes; I have always understood that when mother was sick—and she was always in more or less ill health—that she would transfer her property to Miss Lamb, and at her death it was to come to her sister's children. At one time Miss Lamb stated over that contract at our house. Those transfers that have been read of those various interests had reference to that fact. That was the summer before she died or was killed. It was to come to my brother and myself. It was to be divided between us two.

" *Q.* Do you remember whether or not at that time anything was said as to how it was to be done, in order to avoid the expense of a will, of probate court, etc.?

"*A.* She always said she was going to deed it.   *   *   *

" *Q.* I call your attention to the interview at your house about six months, or such a matter, before your Aunt Jane's death, and ask you to state what your Aunt Jane said the contract was between her and your mother in relation to this property.

"*A.* That they always intended to live together the rest of their days, and that Mrs. Smith's property should be Miss Lamb's, and at her death it should go to the children."

The son-in-law testified that, about six months before Jane's death, he heard her say that at her (Jane's) death the property "should go to my wife and James Smith. I remember her talking over that it had been deeded for that purpose."

The attorney who drew the deed testified:

"I remember seeing Jane Lamb and Rebecca Smith at my office, and having a conversation with them in relation to drawing a deed.

" *Q.* Did they state why they wanted a deed drawn?

"*A.* I cannot remember the exact conversation that took place at that time. I can remember the import of it.

The talk between all parties at that time was concerning their both owning the property, but that they wanted it in shape that if one died the other would get it; and, in making a deed, Miss Lamb made the deed, I believe, to Rebecca Smith, and the understanding was that Rebecca was to make it back again. I think I have it reversed. I told them they would better finish the whole transaction right there, but, as a matter of fact, they did not. They did part of it. I tried to get them to finish the transaction, but she promised to come down again, and she did come down,—Miss Lamb.

" Q. They were to make each one a deed to the other?
" A. That was the idea.
" Q. And then the one who died would have the property?
" A. That was the understanding when they were there at the office. They wanted to leave it in shape so that the survivor would get it. ·
" Q. You made that deed with that understanding?
" A. I made the deed with that understanding; yes, sir; that there would be a deed back; yes.
" Q. Do you remember now whether or not they talked over the fact of their living together and their owning this property, and the agreement between them that the survivor was to have the property,—it was to come to the children of Mrs. Smith?
" A. The talk that they had was that the one who survived should have the property. That was the talk at that time, and that was the intention when they made out the deed. At least, that was what they both of them told me. And this lady, Miss Lamb, came to the office afterwards to make out that deed, and I told her if she would come in we would make it right out; and she said she had to go over town, and as quick as she came back she would see to it. When she came back I was prepared to make the deed, but she did not have the description, and I did not have it, and it ran along. She said she would come right in again, but, as a matter of fact, she did not."

The following facts are either conceded, or are, in my judgment, established by a clear preponderance of evidence: The money which purchased this farm came from the father of complainant and the defendants. Isabella and Ellen released their rights in the estate to their mother without any consideration. Eight thousand dollars was

the purchase price of the first farm. Of this amount, $5,000 belonged to the mother. She gave it to Jane upon the agreement that Jane should take care of her during her· life. ·The deed was made by complainant to Jane after Rebecca was sued by one of the farm hands to recover his 'wages. She then stated that she was not the owner of this land; that she had no interest in it or the property thereon; that she and her husband leased it from Jane; that plaintiff could get nothing from her, as she had no property. She took no steps whatever to obtain a written statement from Jane of her alleged interest. For two years she rested upon this parol agreement on the part of her sister to convey to her. Complainant wrote letters, through her son, to her sisters and brother, after the death of Jane, in which she said nothing about this agreement. She asked them to release their interests to her without any consideration. These letters are inconsistent with her present claim.

 Complainant's husband died October 4, 1895. He lived with his family upon the lands owned by Jane and Rebecca until his death, worked on the farms, and had his support. His son, James, always lived at home with his mother and Jane. The daughter, Mary, was married, and did not live at home after her marriage. The daughter was appointed administratrix of Jane's estate, and made one of the parties defendant to this suit. Her brother presented a claim of $1,800 against the estate of Jane for his labor after he became 21 years of age. To this claim his sister, the administratrix, made no defense. Complainant was cognizant of all these proceedings, and made no objection thereto.

*A. J. Sawyer & Son,* for complainant.

*Lehmann & Stivers,* for appellants.

GRANT, J. (*after stating the facts*). 1. The purpose of this bill is not to enforce the specific performance of the alleged parol contract stated in paragraph 4, but to set

aside the deed made about 30 years afterwards in reliance upon the existence of some such an agreement. The theory of the bill, as stated in paragraph 17, above given in full, is that, if complainant would deed her interest in the land to her sister, her sister would deed over all said joint property to complainant's children before her (the sister's) death, and by reason of the further inducement held out by her sister that by so deeding the property to Jane, and by Jane's deeding it to the children, all expenses of administration would be saved. That theory is supported by the testimony of her son and daughter and her son-in-law that the property was to be deeded to them by Jane. If the testimony of the attorney who drew the deed should be construed into an agreement that in some way, unexplained, deeds would be made by each to the other in such a manner that the property would go to the survivor, and complainant executed her part of that contract by making the deed, and Jane refused or neglected to execute a deed on her part to carry out the agreement, we are not prepared to say that complainant might not be entitled to relief, by a proper bill, on the ground of a contract executed on her part for a valid consideration. But such is not the theory of the bill, nor does such an arrangement accord with the testimony of complainant's children and son-in-law. Nor do the learned counsel for complainant base complainant's rights upon any such arrangement. They base it solely upon the alleged confidential relation that existed between the two sisters. They say:

"Transactions between parties occupying relations of trust and confidence will be carefully scrutinized, and no advantage will be permitted to be taken of the trust relation, and a deed taken by one occupying such a relation should be canceled."

And they cite authorities claimed to sustain this principle. They assert that Jane was the stronger minded of the two, and that she had great and unbounded influence over Rebecca. In this way they seek to avoid the effect of the statute of frauds, which requires every conveyance

of land to be in writing. Section 9509, 3 Comp. Laws.
The circuit judge evidently recognized the difficulty to
thus avoid the statute, for in his opinion he says:

"I am not certain but the bill ought to be dismissed.
*   *   *   The peculiar hardships of the case are such that
I have traversed the territory of equity jurisprudence to
see, if possible, I might not find some channel of relief.
*   *   *   The conduct and manipulation of their joint
property display extreme childishness, superstition, and
ignorance. It hardly seems just to hold them to any legal
accountability. All of their action is characterized by ex-
treme folly. *   *   *   The statute of frauds now con-
fronts the complainant with dangerous menace. If it is
to control in the case, then, instead of operating as a pro-
tection, it will serve the purpose of perpetrating a fraud
and depriving the complainant of her just right."

He further found that there was no fraud or mistake.
There being no fraud or mistake, it follows that the con-
veyance was voluntary. We do not think there is any
evidence in the case to show that complainant made this
deed to Jane at even the request of the latter. She was
not persuaded or influenced by Jane, to execute it. Rebecca
was as strong-minded as was Jane, and evidently had as
much control of affairs as did Jane. We find that there
were no confidential relations such as to avoid this deed as
not within the statute of frauds. The statute is a wise
and beneficent law. It cannot be frittered away because
the parties to deeds are ignorant and do not fully under-
stand their rights. It must govern the conduct of
the learned and the unlearned alike. We think this
case is controlled by the principle stated in *Pier-
son* v. *Conley*, 95 Mich. 619 (55 N. W. 387); *Kelsey* v.
*McDonald*, 76 Mich. 189 (42 N. W. 1103); *McCarn* v.
*Wilcox*, 106 Mich. 64 (63 N. W. 978); *Shafter* v.
*Huntington*, 53 Mich. 310 (19 N. W. 11). Many other
cases of the same import might be cited. Courts cannot
negative the statute because in an individual case it
operates as a hardship.

2. We cannot, however, adopt the conclusion reached
by the circuit judge that this land, "in morals and jus-

tice," belongs to complainant. In the distribution of the estate she is entitled to one-fourth of it. The money, or at least most of it, with which it was purchased, came from the father and mother of all these parties. Complainant has lived out of it for more than 30 years, and has reared her family upon its proceeds. Two of the defendants released all their interest to their mother, and all they were entitled to is invested in this land. We can see no great injustice in the fact that all must share equally.

Decree reversed, and the bill dismissed, with costs of both courts.

HOOKER, C. J., and MONTGOMERY, J., concurred with GRANT, J.

MOORE, J. (*dissenting*). Rebecca R. Smith, James B. Lamb, Ellen Clifford, and Isabella Clifford are brother and sisters, and the only surviving heirs of Jane Lamb, deceased. Rebecca R. Smith and Jane Lamb were twins. At the time Jane Lamb died, the record title to certain real estate was in her. The bill is filed for the purpose of having the title to an undivided one-half of the property decreed to be in complainant. The circuit judge granted the prayer of the bill. The defendants have brought the case here by appeal.

The record is long. Some testimony was taken that is incompetent, some that is immaterial, and some that is unreliable. Among other testimony offered by complainant is a deed of a farm purchased in 1867, taken in the name of the complainant and her twin sister, the deceased, Jane Lamb. This farm was sold, and another purchased with the proceeds, in 1871; the deed running to the complainant and her sister Jane. It is also made to appear that in 1873, when complainant was in ill health, she conveyed her interest in the real estate to her sister Jane, who afterwards reconveyed an undivided one-half of it back to Rebecca. In 1897 Rebecca again conveyed this land to her sister Jane, and the record title remained in her when

she was killed upon the railroad. I have not overlooked the claim of defendants that these conveyances were made to avoid paying debts, but, in view of the small amount of debts, I do not attach much importance to this claim. The lawyer who drew the last deed from Rebecca to Jane testified, in substance:

"I remember seeing Jane Lamb and Rebecca Smith at my office, and having a conversation with them in relation to drawing a deed.

" *Q*. Did they state why they wanted a deed drawn ? * * *

"*A*. I cannot remember the exact conversation that took place at that time. I can remember the import of it. The talk between all parties at that time was concerning their both owning the property, but that they wanted it in shape that if one died the other would get it. * * * I told them they would better finish the whole transaction right there, but, as a matter of fact, they did not. They did part of it. I tried to get them to finish the transaction, but she promised to come down again, and she did come down,—Miss Lamb.

" *Q*. They were to make each one a deed to the other ?

"*A*. That was the idea.

" *Q*. And then the one who died would have the property ?

"*A*. That was the understanding when they were there at the office. They wanted to leave it in shape so that the survivor would get it.

" *Q*. You made that deed with that understanding ?

"*A*. I made the deed with that understanding; yes, sir; that there would be a deed back; yes. * * *

" *Q*. Do you remember now whether or not they talked over the fact of their living together and their owning this property, and the agreement between them that the survivor was to have the property,—it was to come to the children of Mrs. Smith ? * * *

"*A*. The talk that they had was that the one who survived should have the property. That was the talk at that time, and that was the intention when they made out the deed. At least, that was what they both of them told me. And this lady, Miss Lamb, came to the office afterwards to make out that deed, and I told her if she would come in we would make it right out; and she said she had to go over town, and as quick as she came back she would

see to it. When she came back I was prepared to make the deed, but she did not have the description, and I did not have it, and it ran along. She said she would come right in again, but, as a matter of fact, she did not.

" Q. I hand you paper [deed from complainant to Jane Lamb], and ask you to look upon it and tell me whether that is the paper you made at that time for these people?

"A. Yes; this is the instrument."

No other consideration passed. The complainant continued to reside on the farm, and still resides there.

After sifting all the testimony, and eliminating that which ought not to have weight, I am satisfied the circuit judge was justified in finding:

" That Rebecca Smith and Jane Lamb were essentially one, in thought, interest, and action. They lived for each other, and in rare intimacy. * * * The present lamentable condition of the complainant is due to the sudden and unexpected death of Jane Lamb. * * * That, in morals and justice, Rebecca Smith owns at least one-half of the property in question in the case. It was purchased with her money. It was never given away or sold by her. She never parted with the possession of it. She never intended to surrender it, except in the event of her death before the death of her sister. Certainly Jane Lamb did not take the title with any thought or intention of holding it as against Rebecca Smith. It was her purpose to restore it to its rightful owner."

Does the statute of frauds stand in the way of affirming this decree, as claimed by the solicitors of defendants? The statute referred to is section 9509, 3 Comp. Laws, which provides:

"No estate or interest in lands, other than leases for a term not exceeding one year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same, or by some person thereunto by him lawfully authorized by writing."

The case is not free from difficulty. This is not a bill

asking that the representatives of Miss Lamb be required to carry out her oral contract. The complainant does not seek to acquire interests in the lands by reason of an oral contract. The bill sets out all the facts, showing that the only consideration for the making of the deed by the complainant was the agreement of Miss Lamb, which has not been executed, and that there has been an entire failure of consideration for the making of the deed, and asking that the deed made by the complainant be canceled, and the record title be restored to her. The defendants are not invoking the aid of the statute simply to avoid the necessity of complying with the contract made by Jane Lamb, but they seek to use it in such a way as to repudiate the contract, and at the same time retain the title to the land which was conveyed by the complainant in reliance upon the contract. If the facts are as stated by the lawyer who drew the deed, if, the next day after it was obtained, Miss Lamb had refused to carry out her part of the agreement, and insisted she was the absolute owner of the land, can there be any doubt about the right of a court to grant the complainant relief? Does the fact that Miss Lamb died before carrying out her agreement prevent the court granting relief? Do the heirs of Miss Lamb' stand in any better position than she?

In Browne, Stat. Frauds (5th Ed.), 145, in discussing the effect of the statute of frauds, it is said:

"A party, however, who has paid money in fulfillment of a verbal contract, which the other refuses or becomes unable to carry out, may recover it in an action for money had and received; he may also recover property, or its value, delivered in the same way, by any suitable proceeding," citing a large number of cases.

In *Kilbourne* v. *Wiley*, 124 Mich. 370 (83 N. W. 99), there is a discussion of the statute of frauds, where a solicitor sought to enforce an oral agreement that he should have a lien upon land for the value of his services in clearing up the title. The court quoted with approval from *Huxley* v. *Rice*, 40 Mich. 73, as follows:

"'It is the settled doctrine of the court that, where a conveyance is obtained for ends which it regards as fraudulent, or under circumstances it considers as fraudulent or oppressive, by instant or immediate consequence, the party deriving title under it will be converted into a trustee, in case that construction is needful for the purpose of administering adequate relief; and the setting up the statute against frauds by the party guilty of the fraud or misconduct, in order to bar the court from effective interference with his wrong-doing, will not hinder it from forcing on his conscience this character, as a means to baffle his injustice or its effects. 2 Comp. Laws 1871, §§ 4692, 4693; 1 Story, Eq. Jur. §§ 330, 333; 2 Story, Eq. Jur. §§ 1254, 1265; 1 Spence, Eq. Jur. 511; 2 Spence, Eq. Jur. 194, 294, *et seq.;* Hill, Trustees, 144; *Mestaer* v. *Gillespie,* 11 Ves. 621; *Pickett* v. *Loggon,* 14 Ves. 215, 234; *Barnesly* v. *Powel,* 1 Ves. Sr. 284, 289; *Young* v. *Peachy,* 2 Atk. 254, 257; *Brown* v. *Lynch,* 1 Paige, 147; *Hutchins* v. *Lee,* 1 Atk. 447; *Wolford* v. *Herrington,* 74 Pa. St. 311 (15 Am. Rep. 548); *Gregory* v. *Williams,* 3 Mer. 582.'

"See, also, *Miller* v. *Aldrich,* 31 Mich. 408."

In *Nugent* v. *Teachout,* 67 Mich. 571 (35 N. W. 254), Nugent conveyed to Teachout 40 acres of land. The latter agreed orally to convey, as part payment for the land conveyed to him, an acre of land, and the house thereon. After he got the deed, Teachout not only refused to deed the acre of land, but sold it to a third party. Nugent sued Teachout. In holding that Nugent could recover, the court said:

"But it must be remembered that this promise on the part of the defendant to convey the Cadillac property in part payment of the lands received by him was an oral one, and therefore within the statute of frauds, and one that he could not be obliged to perform. What, then, are the rights, and what is the remedy, of the plaintiff? He has conveyed the 40 acres to the defendant, and the defendant has received it, and accepted the benefit of it. Does he not, in equity and good conscience, owe the plaintiff the balance of the price or value of the land in money? Is there not an implied promise on the part of the defendant to pay the plaintiff the price or value of the land conveyed? We think there is. Although he was not

obliged to convey the Cadillac property, because his promise to do so was void under the statute of frauds, yet his refusal to convey had the effect to rescind the contract, and raised an implied promise to pay for what he had received upon it. *Gray* v. *Hill*, Ryan & M. 420; *Basford* v. *Pearson*, 9 Allen, 387, 392 (85 Am. Dec. 764)."

In *Champion* v. *Munday*, 85 Ky. 31 (2 S. W. 546), part of the consideration for a conveyance of land was an oral agreement that the vendee would give to the vendor the right of passage over lands not mentioned in the deed. In disposing of the case, the court said:

"As the deed was not signed by the appellant, nor any writing executed by him evidencing the appellee's right to the passway, it is urged that the contract is within the statute of frauds, and cannot be enforced. If simply a passway over the land sold had been reserved by the deed, then, of course, this question would not arise; but the right is claimed to a passway through other land belonging to the appellant. Equity, following the law, will not enforce a contract within the statute. Here, however, it has been executed upon the part of the appellee, and the appellant accepted the deed and had it recorded. There is no offer by him to rescind. He placed the appellee in the use of the passway, while he is in possession of the property; and a court of equity will not, under these circumstances, permit him to hold it, and yet refuse to pay for it. If he declines the one, he must do the other; otherwise the statute would become a means of injustice, and enable a party to commit a fraud, thus defeating the very object of its enactment."

In this case defendants retain the title conveyed by complainant to Jane Lamb. They do not offer to rescind the contract, but seek to retain all its advantages, and at the same time repudiate all obligations under it. The statute of frauds was passed to prevent frauds, and it ought not to be so applied as to perpetrate a fraud. If there is such a variance between the case stated in the bill and the proofs as to prevent justice being done, I think it a proper case to permit an amendment of the bill.

The decree of the court below should be affirmed, with costs to the complainant.